at Owl. Arguments not to exceed 15 minutes per side. Mr. Gingras for the appellants. Before you start, I think I'm sure everyone has been told that Judge Guy is on the phone. And I guess I ought to say good morning, Judge Guy. Good morning. Thank you. Good morning, Judge Guy. Good morning,  Good morning, Judge Guy, and good morning to you too. If I may, I'd like to reserve three minutes for a rebuttal. May it please the court, obviously the question that we're here to talk about today is immunity under the Communications Decency Act. Now that's a question of first impression for this court and the circuit. Judge Griffin, I know that you were on the panel in the Doe versus Sex Search case, which was from 2008, and although that case was not decided on the CDA, it was part of the lower courts or a big part of the lower courts ruling, and so you may have some familiarity from that case. But for me, this is not a matter of first impression. This is, I think, the 30th case I've handled for this particular client. I've handled at least that many cases under the Communications Decency Act for other clients, and in that time, one thing that has really dawned on me is that a lot of people don't accept the premise of this law, and that's where they go wrong. And I think that's where the district judge in this case went wrong, and I think you can confirm that fact by looking at his post-trial ruling from August of last year, where he said that he felt the CDA should never apply to website owners who screen content. Now make no mistake about it, no court anywhere has ever agreed with that ruling. No court anywhere has ever come close to agreeing with that, and in fact, the two cases that the judge cited for that premise, roommates and accu-search, both stand for exactly the opposite rule. And that's no mistake either. The most important thing to understand here is, I think the district court felt that by narrowing the scope of immunity, that would somehow make the Internet safer, that it would reduce the amount of offensive content, because if we hold website operators liable for offensive content on their sites, well, that'll keep them on their toes, that'll make them restrict what they publish, and I would be saying that this court would be better off without the doctrine of judicial immunity, because if you could be personally sued for rulings that you make, that would keep you on your toes. I completely reject that argument. I would like this court to reject that argument. Congress has already made a policy decision in this area that website operators should be encouraged to screen content, because that's a good thing. Imagine that Ms. Jones's argument was testimony, and it's undisputed in his summary judgment affidavit, which is, I think, document 64-2. His testimony was that he only allowed about 10 or 20 percent of what people submitted to the site to be published, which means he rejected somewhere between 80 and 90 percent of what was submitted. If her position is correct, what that means is, website operators like my client can  screen content. That has to be allowed, because if they block anything, they're going to be held liable for anything that remains. That is an extremely dangerous rule, and it's directly contrary to what Congress wanted this law to do. In addition, the main concern that I have is that the court's ruling actually punishes responsible website owners. The more screening a website does, according to the district judge, the more liable he should be. That was the standard in 1995, before this law was passed. That was exactly the intent of Congress to overrule that type of theory from the Stratton Oakmont case, where the court said, if you moderate content, if you screen content, if you create rules regarding what's allowed and what's not, that makes you a publisher, and publishers have a higher level of liability than distributors do. And that was exactly why they used those words. Publisher is not allowed. You cannot treat the operator or user of an interactive website as a publisher when the material comes from a third party. I thought, I think, I think you just, you used the word modify, and I thought that the, I thought that the gist of what your client was doing was either choosing not to post items or deleting portions, not modifying in a way that would be anything else. In other words, not rewriting posts or something like that. First of all, that word modify is something that came up a whole lot during the four and a half years that this case has been pending. There was an interview that my client did with Dr. Phil, and I think it was, there was a transcript of that interview. It's in the record. And during that interview, this word modify came up. I think what he actually said was moderate. I was on that, that show with Mr. Ritchie, who's here, and what he was talking about was moderating content, not modifying. Moderating by deletioning or not posting, or moderating by rewriting. No, no, no. Moderating by selecting among the thousands of submissions that come in and choosing this one's acceptable and that one's not. That's what a moderator does. Well, I mean, you, the word doesn't have a single meaning in that context, at least from a lay point of view. I mean, if someone uses a word in an opinion that I think is somewhat intemperate, or I would suggest perhaps another word, and... Well, sure. But what we're talking about at the end of the day is publishing and editorial actions. If you read these books, they talk about the actions of a publisher, the actions of an editor. What do those type of people do? And what they do, what a publisher does is they receive manuscripts or books or whatever it is, and they pick and choose. And they say, well, this one's good enough. I'm going to publish that one. This one I don't like. I'm not going to publish that one. And that type of publisher conduct prior to 1996 could cause a website to be liable for what users posted. I think, I'm still not sure you're answering my question. If I understand this case correctly, Mr. Ritchie chooses what to publish. Correct. He makes an effort not only not to publish things he just doesn't want to publish because he doesn't think they'll rise to whatever level of piquing the interest of his readership. He also doesn't publish certain types of things that would be considered illegal or offensive. More offensive, presumably, than the things here, although some might turn these things pretty offensive. But he doesn't. He's not rewriting the posts to make them his own. He's not rewriting them, although if you read cases, there's one from the Ninth Circuit called Batsell. I think roommates also touches on this. Rewriting is okay. Rewriting is allowed as long as you don't change the meaning of what the original author wrote. Roommates uses an example of this in the context of the word development, which is what we really focus on in our brief. If someone writes, Sarah Jones is not a thief, and if Mr. Ritchie removes the word not from that sentence, he's changed the meaning, and that's what roommates was talking about as meaning development. That's the line that you cross where the website becomes responsible. That line was never crossed in this case. There were two summary judgment affidavits. There's one of them is 64-2, and the other one is, I think, 177. Both of those affidavits were completely uncontested by Ms. Jones. Mr. Ritchie explained what he does and doesn't do. He absolutely screens content, because that's what Congress wanted him to do. He doesn't want nudity, profanity, racial slurs and threats on his website. He wants to at least keep the tone to some level of decorum. I realize the district judge in this case felt that the entire website was I think we put in plenty of evidence that showed that's not the case. There are stories about President Obama. There are stories about school shootings and the World Series and what have you. It's whatever users want to submit and talk about that appears on the site. It need not be negative. It need not be offensive. People submit positive things all day long. What Mr. Ritchie's role is, is just to basically be a gatekeeper, to say, look, if someone submits something that looks like child porn, I'm not going to publish that. He does a little bit more than that. He also comments. He sure does. And that's a little bit different than examples you've talked about at least so far. And Judge Bertelsmann, I think, ruled that his comments showed that he ratified the defamation postings. Which is exactly what the CDA says is not allowed. What the CDA says is you can't treat him as a speaker or publisher of material from someone else. But what if he did, what if his comment, he did adopt it by reference or somehow, I mean, I assume that there are ways that you could ratify, that you could show that you agreed with a comment and then I, I mean. The argument's been made. I've cited Ken. You argue that's not what he did here. That these comments were rather innocuous. They were not defamatory. And I guess they weren't sued themselves. There's not a separate claim that the comments themselves were libelous. In her first deposition, Ms. Jones said that Mr. Ritchie's comment about her being a freak in the sack, that was what he wrote. She tried to argue that that was defamatory. Part of the problem is that, as you may have heard, in the middle of this case, she was arrested and had some legal problems of her own. And that produced some evidence that we believe showed that the freak in the sack comment was actually true. If it had been alleged to be defamatory, we would have defended on truth. And so she withdrew that theory from the case and we thought that was basically a dead issue. I understand that Judge Bertelsmann raised this ratification theory. And there are cases that I've cited. One of them is called Parisi v. Sinclair. Okay. Before you get to that, I mean, at this point, there is no separate claims as to the comments themselves. I don't believe so. I think, obviously, there was a single defamation cause of action. There was a jury instruction given. The jury didn't separate the comments from the postings. No. They did not. And there was no claim against. Because you would admit, Mr. Ritchie, is the curator of the comments. He does not have immunity for his comments. Of course not. And when he comments, the system actually puts his comments in bold and he always signs it in ink so you can tell which is his words and which is someone else's. And again, the freak in the sack comment, Mr. Ritchie never denied making that comment. His position was always that was purely my opinion based on the fact that you often find these school teachers getting arrested and in trouble or having these sexual occurrences happen. That's what he was talking about. He was just expressing an opinion. He wasn't agreeing with the details of what the person. He didn't say, I know she has STDs because I saw the test results myself. If he had done that, that would not be a CDA issue at all. The only reason it's a CDA issue is because she's trying to impose or did impose liability because of what someone else submitted. I'm thinking of analogies. I guess letters to the editors, sometimes the publisher of a newspaper will comment on a letter to the editor and it would be the same thing that the publisher of the newspaper, if he had this immunity, I mean this is a different animal here, but that shouldn't be ratification. Okay. I'm a little concerned about whether Ms. Jones would have an oversight operator. Is there an effective remedy against the creator of these posts who's anonymous that, I mean, she on her face doesn't know who they are, this person, but is there a remedy and is it effective for her to actually go against the creator of these posts? The answer to that question is always yes. How does that happen? Well, she'd have to, first of all, my time's almost up, but she would have to, first of all, do some discovery and figure out who the author was. Discovery and what kind of a suit? Who do you sue? Well, she would sue a Doe defendant and then serve a subpoena on Dirty World, which is the operator of the website, and ask for the IP address. Unfortunately, in this case, because of the time that had passed and the old system that they used, there was no IP address. It doesn't mean that there wouldn't have been other ways of finding the author. Would Dirty World have resisted the subpoena based on some sort of privilege or? No. There's a lot of case law on that issue, and the answer is no. If she presented a valid subpoena and demonstrated... So there's no privilege. I can't think of what the privilege would be, but... It's a First Amendment right to remain anonymous, and there is case law that says you can object to a subpoena on that ground. We receive subpoenas all the time and comply with them all the time. So that's not a ny record that we could give her anyway. I see my time... Counsel, Judge Guy, I take it that the essence of your position is not that someone in your client's position couldn't be liable as an information content provider, but that under the facts of this case, he isn't, because he didn't create or develop the actionable language. Judge Guy, I think that's exactly correct. The CDA is really just a line, a firewall, if you will, that is drawn between one author or one speaker and another. And so because my client didn't create or develop the content that she said was false, that's where I think the line prevents her from proceeding against my client. Not against the author, but she never tried to do that. Back in the days when he was in Scottsdale and he was the total content provider, if he provided something that was actionable, he could have been sued, could he not? Absolutely yes. The CDA would not have been raised at all in that sort of context. Thank you. Thank you. All right. Your Honors, may it please the Court. My name is Christopher Roach. I represent the appellee, Sarah Jones in this case, the plaintiff in the case below. I think that what the district court was doing in this case was actually setting a very narrow factual situation which wouldn't be afforded immunity under the CDA. Specifically, when... What the district court did is not something that any other court that has considered this has done, right? This is his own test. It is. He has adopted what he could gather from the other circuits that have already made a decision and formulated it based on those. One of the examples that he used, one of the cases that he relied upon was roommates, which required the users to input certain fields so that they had to input their sex, whether they had kids and what their sexual preference was in order to be able to use the site. For all intents and purposes, based on his purpose behind the site, which was to basically have a gossip site, he was the one who controlled everything that went through. See, roommates, that was illegal, wasn't it? Yes. Not under the local ordinance. And having a gossip site is not illegal. I mean, there's a lot of things on here that are not defamatory, did not violate the law. And I think that part of it is through his own testimony, what his purpose behind the site was. Mr. Ritchie's own testimony? Yes, Your Honor. Mr. Ritchie did say that he wanted to pull in information that would knock people off their high horse, that would be insulting and humiliating. I mean, it's not just asking for people to post whatever they want. He's asking for people to post stuff which will be, you know, there's going to be a lot of defamatory material that's coming towards him. That doesn't mean it's actionable. It doesn't mean it's illegal. I mean, it might be sensational or whatever, but getting back to Judge Bertelsman, I mean, he really, he looked at other cases, but he crafted his own test, did he not? To be honest, Your Honor, I don't view it as crafting his own test. Okay, tell me what other circuit has filed Judge Bertelsman's ruling here. There hasn't been any specific factual circumstances which have been the same. Judge Bertelsman was looking at... The answer to that is that no other circuit has used this test and no other court, correct? Yeah, I mean, in plain terms, yes, but I think it's because the factual scenario is different. We aren't talking about creation, which is sort of, here it is specifically about the development of the content which he's doing through his purpose behind the site, the fact that he has the dirty army. He's posting comments. As soon as the posts are put up, he posts his own comment below it. You know, what... It's really hard to tell how under Judge Bertelsman's rule, anyone who would not, in the sense Judge Bertelsman was using the term, be seen to ratify their comments. And that does not, that specifically does not seem to be what the CDA had in mind. Well, I mean, the CDA had in mind that it was trying to protect the internet service, the providers, the websites who actually went out and tried to, in good faith, do some sort of editing to try to prevent illegal content from being on their site. What is it that Mr. Ritchie is doing that anybody who creates a website that other people can post on, what's he doing differently? Well, I mean, if you take, for example, you can do Facebook. If I were to post on Facebook, there's going to be, it's my comment that goes on, there's going to be a certain program that checks to make sure that something really illegal isn't happening, but there isn't anything on Facebook saying, you know, you should post gossip, you should post this potentially defamatory material. And I think that that's really the difference. It's not, he's not applying a good faith standard in trying to edit these comments, to choose what comments to put on. That standard is good faith? If you do something that's not in good faith, then you're liable? Well, it's just evidence of being, of showing that he was trying to, because in this case, he's using his editorial capacity to try to only include material that is, you know, reaches his standard for being sensational. You know, there's... Sensational, is there anything wrong with sensational itself? No, I mean, there isn't, but I think in this case, he's providing the same function as essentially that computer program, the website on roommates. He has such control over it that he's trying to post... In fact, the parameters in roommate violated the law. Wasn't that the ruling of the Ninth Circuit? Yes, but it was also because the, I mean, so defamation in and of itself is its own violation. It's a... Well, if he only allowed posts that were defamatory, then maybe. But I doubt that's his standard. Well, I think that he's, I think that that good faith, his lack of good faith in editing and choosing what to put up, plus his use of the tagline in adopting it as a, it's a way to show that he was trying to get that material. You know, Congress, by enacting, it's a strange named statute of the... What's it, Computer Decency Act? Communications Decency Act. Yeah, to allow indecent communications under the Decency Act. I mean, didn't, I mean, Congress made a judgment that they really didn't want to figure out if the editorial judgment was right or wrong, and they didn't really want us to do this stuff. They looked at who generated, who created and developed the comments, and that's what we look at, rather than the comments, is that the creator or developer may be liable, but the website owner, the information content provider is not. I mean, isn't, I mean, the substance of the comments, isn't that the whole purpose of the Communications Decency Act, is to get away from looking at the substance of it and determine whether you're a creator or a developer, or whether you're just the content provider? Sorry, I'll try to answer the question as best I can. It's the point of, it is to protect the content, the websites for when stuff is posted to them. And when Congress enacted the Communications Decency Act, specifically they were looking at what were called bulletin boards. It's almost like Facebook would be a forum where somebody goes and posts a message. Typically those, in that first case, the Stratton Oakmont, the website operator was actually hurt because it decided to edit out some illegal content. And that's where that good faith standard is coming from. Here, I mean, it's, and I might not have answered your question. Well, Congress wanted us to get away from that good faith standard, right? I mean, that was one of the purposes of enacting the statute. No, Stratton Oakmont, I believe, was actually saying that the website operator did act in good faith in attempting to remove the illegal content, but that in the end, he was, the website was negligent in not removing all of it. And so Congress enacted the Communications Decency Act, the immunity portion of it, in response to that, specifically for good faith attempts to edit. Is good faith in here? It's not in the statute. I didn't see it in the statute. You're right. It's not in the statute itself. I think it might be under one of the headings, but as far as the substance of the statute, it's not listed. Well, you know, in retrospect, it might be questioned, I suppose, whether the goal of achieving editing and self-restraint had been achieved. But that's what Congress had in mind, wasn't it? Well, I mean, I guess I should say the way that the Ninth Circuit interpreted it in roommates, or at least the, I guess the sort of message that it came out with was that the message to website operators is clear, is that if you don't encourage illegal content, then you will be immune. And I think that that's what's happening here, that Mr. Ritchie, through his operation of thedirty.com and all the factual situations, basically was encouraging people to post defamatory material, which he had. The notion is you don't become a publisher by preventing illegal and offensive beyond a certain level, perhaps, however we want to describe that, things from appearing on your website. Yes. I mean, if it's just something that's coming up to be, if it's just something that's being placed on the website, so the passive acquiescence of information being posted, it's clearly inside the immunity realm. In this case, though, I don't think that the factual scenario fits, considering that, you know, all the information, he knows that, I mean, he even states at one point that the internet, you can pretty much do anything, it's the internet. I think that there is, his intent in having the website is to post sensational items that specifically go towards defamation. It's, sorry, the, which I guess the other part of that was he's also adapting, and he has complete control who posts, and then he also will post the information, and then he puts his own tagline to it, which in its own way can be something that helps develop. It's something that encourages somebody to post illegal content. You don't claim that any of his postings were defamatory in and of themselves, do you? No, but it's one of those things that have to be, that we strongly feel they have to be read together, that it has to be the comment is essentially saying that this is true, you know, look what Sarah Jones is doing here, she has. Well, why don't you give us an example of one that you think says this is true? Well, specifically with the first one with the saying Sarah had slept with half the Bengals team, he posts that, basically about Shane being a sex addict. He's basically agreeing that chances are, yes, this did happen, and that, you know, she probably did sleep with Shane Graham. Coming after that, there's another post that's, it's about five weeks later, which is specifically about Sarah and her husband and the gonorrhea and basically saying that she has STDs, and he follows up with another comment saying that why are teachers such a freak in the sack? I think that those themselves are ratifying what the posts above are saying, and they also encourage additional posts. I mean, the only way to get onto the website is to be filtered through Mr. Ritchie, who specifically has his own set of standards for the sensationalness of the post. Is this kind of aiding and abetting defamation? I think it, I mean, it's defamation in itself to the extent that he has control over, I mean, he didn't have to put his comments on. I mean, he decides to put his comments on at the end. I just don't think that the immunity portion will attach to this specific factual scenario where he's adding his own taglines. The immunity obviously doesn't apply to the person that created the post, the anonymous person. Did you try to sue the anonymous person that did the post? I believe the suit was only brought against... I know. My question is, did you try to sue the anonymous poster? No. Why not? We went after the website and initially named the wrong website as... Okay, I realize that, but why didn't you try to sue the person who did the post? To be honest, I'm assuming that it was because there... You weren't the person who filed the suit. No, I was not. It was Mr. Dieter's no longer able to... You concede you could have? That your client could have? I guess rather than talk about you, your client could have sued the person who actually did the posting? Yes, in normal circumstances that you... Why isn't that an effective remedy then? Well, specifically here, Mr. Gingras did say that they were unable to get records for that point in time, but I think at this point with the type of website that he has set up, that even if you go after the person, there's no way to prevent the actual anonymous user, there's no way to prevent the website from continuing to keep the information up. So they're still being damaged continuously, and there's no way to really prevent them from... Well, the reason... The idea would be if there were successful suits against posters, then presumably that would deter people from posting defamatory comments. And that would prevent... It might prevent future postings, but it also doesn't mean that the current post that's out there is going to be removed or that there would be any remedy for that. If they're tied up in litigation constantly because there's lawsuits all the time against the people that are actually doing the defamation, at one point it's going to be economically infeasible to have this website going on because you're going to be tied up in litigation all the time. But evidently that's... I mean, that may be one way to actually prohibit this, but it's down the road. Okay, I wanted to make sure that there was a remedy, and I wasn't sure at first whether there was or not. I think your time is up. Is there no further questions? All right. Mr. Gingras? Gin like you drink, grass like you mow. Gingrass. I should have known that the clerk checked it out before calling the case. There were a couple of points I heard that I really want to lend some assistance to. One was this issue of good faith. The statute actually does have a good faith requirement, but not in the provision that we're talking about. The CDA has two parts. There is Section 230C1. That's what we're talking about in this case. There's a different section called 230C2. And the C30C... I'm tripping myself. 230C2 has a good faith requirement, and that part of the law deals with... What it says is that you can't sue a website owner for blocking content in good faith. And this is almost never used. I guess the theory would be, and actually there's a new case that's pending right now. Would it be the anonymous poster who is suing? No. The context where I think it would come up is some kind of like a Lanham Act false advertising claim where if there's a website that has a comment praising some product or service in some way, and I have a competing product or service, and I want to comment and say something to the contrary, and I try to post that content and it's blocked, that might be a C2 issue. And there's a case. It's cited in my opening brief. It's called Levitt v. Yelp. It's in the Table of Contents. That case deals with the issue of good faith, and it talks about that. So if you need any guidance, I'd suggest that you look at Levitt v. Yelp. Section 230C1 has no good faith requirement. And Levitt v. Yelp analyzed, should we have one? Did Congress intend there to be a good faith requirement? And the answer was no, because for this very reason that you'd wind up in litigation over little blogs, comments, was it good faith? I'm sorry? That was a Central District of California case, and it's currently pending on appeal before the Ninth Circuit. It's been sitting there for about two years, and there's no decision. The second issue that I wanted to briefly touch on was this ratification issue. We talked about it before. Mr. Roach talked about it a little bit. I defended a case back in 2007 and 2008. It's cited in our pleadings. It's called Global Royalties v. Eccentric Ventures. And in that case, there was an issue. That was a different client and a different website. That website never removes any content, period, ever. And under the CDA, it's been very successful in defending that practice. And in Global Royalties, the actual author of the post was sued by the company that he complained about, and the author approached the website and asked, I want to remove my post. I want to take it down. I didn't mean to say this. I think he actually said that it was false, but I'm not sure that he was telling the truth. And the argument was made that because the website refused to allow the author to remove his own comment, that that was ratification, that you've now adopted it as your own because the website wasn't allowing the author to remove it or delete it. And the court in Global Royalties looked at that issue and said, no, the CDA talks about development and creation at the time the material is submitted to the website. And later decisions, whether to remove or not remove, those are all editorial decisions that are protected. And so the court ruled in our favor in that case. And that was one of the stronger ratification arguments I've seen. And again, it wasn't successful there, and I don't think it should be successful here. The final point, Mr. Ritchie did remove these posts about Ms. Jones. Judge Bertelsman in his ruling says it's factually untrue, but he says that Mr. Ritchie refused to remove them. That's not the case. His affidavit specifically said that he took them down. At some point, we don't know the exact date, but this issue about an effective remedy, Ms. Jones had an effective remedy against the author, and the posts were removed. Does it matter that he removed it or not? Would that go to damages? I mean, it doesn't seem to go to liability, does it? No, it would go to damages. You're right. But, again, I'm just sort of emphasizing that Mr. Ritchie acts in good faith. He's not trying to hurt people. But good faith is not the standard, so that's not the argument. You're right. So maybe we're done. I think we are. All right. Thank you. All right. We appreciate the argument both of you have given, and we'll consider the case carefully. Thank you.